19-2495 and 19-2496. And Council, Mr. Meeks? Yes, Your Honor. Morning, and welcome to all, Council. Actually, is your friend in? It's hard for me to tell. Hold on. I'm here, Your Honor. Oh, terrific. Great. Thank you. Welcome. Welcome to both of you. We're happy to have you. Mr. Meeks, are you going to reserve any time? Yes, Your Honor. I would like to reserve five minutes for rebuttal. Okay, that'll be granted. I will take care of the timing. I suggest you do so yourself, okay? So, without further ado, Mr. Meeks, you may proceed. Thank you, Your Honor, and may it please the Court, my name is Nolan Meeks, Deputy Chief Counsel for the Pennsylvania State Police, and I am here this morning representing the appellant, Corporal Brian Devlin, with the Pennsylvania State Police. Your Honors, our argument in this case is straightforward. Corporal Devlin is entitled to qualified immunity in this case based on an analysis of the second prong of qualified immunity, which is the clearly established prong, because on October 5, 2016, there was not factually similar precedent that would put Corporal Devlin on notice that the actions that he took on October 5, 2016, were unconstitutional. So, as I'm sure the Court is aware, in recent years, the United States Supreme Court has issued a number of decisions regarding qualified immunity. In Muellen X. V. Luna, Wesby v. District of Columbia, Casella v. Hughes, the Court issued these decisions, and the overarching takeaway from those cases is that there must be a high degree of specificity and relevant precedent for, to meet the clearly established prong in those cases, and simply in this case, that standard is not met. There is no controlling precedent that would have put him on notice that his actions that night of having the appellee's wife get out of the vehicle during this incident was unconstitutional. Mr. Meeks, your high-level overview is certainly accurate. The Court has been increasingly strict about cautioning the lower courts not to define the right at too high a level of generality. But why, in this case, isn't Abbott v. Latshaw directly on point? Doesn't that case stand for the proposition that a law enforcement officer is not allowed to intervene or take sides in a private repossession like the one here? Well, your honor, that may be the general statement of the law, but as, you know, I'm sure the Court is aware, when we're looking at the second prong, we look at the precedent and the facts of the precedent and compare it to the cases or the situation that we have here. And I think, you know, just to point the Court to a recent decision, James v. New Jersey State Police, um, that case, um, That was a shooting case, right? It was a shooting case, your honor. There was a man that was in distress that had a gun in his hand and was suicidal and the police shot him. Right, your honor. But that doesn't have much to do with, um, much with a repossession, right? Well, the analytical framework and how the Court reached its determination in that case, I think is important and instructive of how the Court should really go about and analyze that immunity turn on, um, when the Court compared it to the Bennett case of pre-standoff knowledge, the distance between the officers, um, the level of compliance. So even though it was similar in that it was a shooting case involving a police officer and a non-compliant individual, those specific factors, those nuances really turn the question. And so when we're looking at this case and, you know, looking at the nuances and comparing it to the Abbott case, um, in the Abbott case, there was no, you know, both sides in this case called for, um, a police presence. They both wanted the police to resolve this situation. And so Corporal Devlin, he was called to the scene by a subordinate PSB trooper, um, because that trooper was unsure of how to handle the situation of having, um, this individual barricaded in the vehicle with the tow truck, um, backed up to it. Counsel, I mean, I, I get it and it's probably a naughty situation, but the video is a little bit telling. Um, you can hear the officer saying, let these gentlemen do their job. I mean, it is one, obviously, you know, if there's, uh, an officer there for peacekeeping purpose, that's fine. But he says, you know, let these gentlemen do their job. Um, and also he threatens to remove her, uh, if she doesn't comply. Um, that, does that go a little beyond just a peacekeeping function? Well, your honor, I think we must keep in mind the situation that he was presented that night. He, he doesn't, he has to resolve this situation, um, you know, at the time. And then, like I said, it's a dynamic situation, you know, perhaps, you know, maybe different decisions could have been made, but you know, there's nothing in the case law where there's no cases that tell him to put him on notice that having miss, uh, miss Johnson get out of the vehicle is unconstitutional. There's simply no cases or factually similar, um, scenario. And just to get, sort of get back to the Abbott case, um, because I know that's the case that- Counsel, can I, I'm sorry, can I just interrupt for one moment with a question? Sure. Certainly, your honor. You said, you said perhaps different decisions could have been made. That, isn't that the heart of what the jury found here and what the district court was ultimately deciding on the request for qualified immunity, that there was a, an absolutely different decision that could have been made, which was to keep the peace, to return the parties to status quo, to remain neutral in the decision-making process. But he didn't do that, right? And so I'm still not following why that isn't significant under the prior decision. Well, and I guess your honor, to be clear, when we're looking at the Abbott case, and I guess that's the case that we're dealing with, it's a land or, um, you know, it's a husband and wife, um, situation, you know, there's no bank involved, there's no tow truck involved, you know, both parties aren't calling for a resolution. The actions of the, uh, police lieutenant in, in that case, um, not only did he threaten to arrest, he actually arrested and he gave a citation. So if you read that case, if you're, if you're Corporal Devlin or any other reasonable officer, it's not exactly clear where, where it turns beyond, uh, you know, into substantial aid. You know, is it the, is it just the threat or is it the actual arrest? In that case, it went all the way through the entire, uh, the entire procedure on the part of that officer. And additionally, your honors, in the Abbott case, uh, the case was remanded back to a jury because I believe the court found that a jury could find that those actions amounted to substantial aid, which is a little bit different. So I don't know if it tells us exactly that these actions are unconstitutional. Mr. Meeks, isn't, um, it a problem for you that this went to a jury? Many of the, the, uh, Supreme Court precedents regarding qualified immunity were, were cases that didn't go to a jury. And here we have to view the record in the light, most favorable to the verdict winner, Ms. Hyman. You'd agree with that, I assume, right? Um, yes, your honor. Um, so one of the, there were a few key factual disputes here. One of which was whether the car was actually hooked up at the time Corporal Devlin arrived, correct? Yes. So, so don't we have to assume, uh, you know, we're not the fact finders. Don't we have to assume, um, that the jury found that, that, uh, Ms. Hyman was telling the truth and Ms. Johnson was telling the truth when they said that the car was not in fact hooked up. So to Judge Mady's point about the status quo, um, Corporal Devlin could have just said, look, uh, Ms. Johnson's in the car and, uh, you don't have the car hooked up. So, uh, you're not going to be towing the car tonight. Um, especially in light of the admissions during the trial that Corporal they have to avoid a breach of the peace situation. And once they have a breach of peace or as Corporal Devlin testified, a disturbance or a situation, um, isn't it incumbent upon them to resolve the situation by just sending the tow truck driver away? Um, I don't think so necessarily, your honor. It's like, it's a situation. I mean, police are called by both parties because they wanted a resolution to what is happening in this case. And so, you know, the first officer didn't know what to do. He has to call a senior officers due to the uncertainty of how the situation should be handled. And so when Corporal Devlin arrives, he makes the, you know, after assessing the situation, he makes the decision that he believes is right. And that decision was to have the individual that was barricaded in the vehicle remove herself from the vehicle. And I think, you know, even though the jury may have returned a verdict, um, on behalf of Ms. Hyman, I don't think that really necessarily gets to the second prong of qualified immunity where we're looking at previous case precedent and applying it to the facts of this case. But doesn't the jury, doesn't the jury instruction articulate what the clearly that if the jurors found that Corporal Devlin was a principal reason or a cause agent for the repossession, then that violated clearly established law. Wasn't that what the jury was charged to decide? Um, I'm not, I'm not sure your honor. I'm not, you know, familiar. So I can't say with certainty, that's what the jury was charged with. Um, but you know, when we look at these cases, the prior precedents cited by the district court, they don't have the factual specificity that is demanded by the Supreme Court, um, in these particular cases. But there was no objection to the jury charge by your, I know you weren't trial counsel, Mr. Bar, Bar Casey, I guess was, but there was no objection to the jury charge, right? Well, your honor, we certainly, um, you know, raise the issue in our, in our first trial motions, um, regarding qualified immunity and the district court didn't, you know, cite that as a reason why that argument couldn't move forward. Um, so I don't, I'm not sure if that's, you know, what happened at the trial level. Counselor, your, your 10 minutes is up. Um, I would ask that on, on, uh, during your five minute rebuttal that you address, uh, uh, some of, uh, the punitive damages issue. Certainly. I will ask my colleagues. Do you have any other questions you'd like to pose right now? No, nothing. Okay. Thank you. All right. We'll, we'll hear from Ms. Bennett. Please look for it. Jennifer Bennett for the appellee and cross appellant. Ms. Hyman, unless there are questions on qualified immunity, I'm planning to focus my argument on punitive damages. And I want to start by reiterating the question we're asking here, which is, does the constitution prohibit the jury's punitive damages award? And in answering that question, the Supreme court has made very clear that the constitution doesn't prohibit a punitive damages award simply because a court may have, um, believed a different award would be better. Instead, the constitution only prohibits a jury's punitive damages award. If it is so grossly excessive that it serves no legitimate need. And as the Supreme court explained in Gore, most cases won't meet the standard. So there have only been in fact, two cases in which the Supreme court has, um, overturned a jury's punitive damages award on constitutional grounds. And in both of those cases, it was for fundamentally legal reasons. So in state farm, the legal problem with the jury's award was that it punished conduct that was entirely unrelated to the claims that issue in the case. And it did. So it was conduct that occurred in other States where it was legal. And what the Supreme court said was, you know, it can't be that one state can regulate conduct in other States where it's legal. And it has no relation to the actual claims in the lawsuit. Similarly in Gore, there was a fundamentally legal problem with the jury's punitive damages award, which is there was no reprehensibility here. So those are the kinds of rare cases in which the constitution has anything to say about punitive damages. This is not one of those rare cases. In this case, unlike in Gore, the jury could have, and apparently did find that corporal Devlin's conduct was extremely reprehensible. Um, and I want to point to in particular three factors that distinguished corporal Devlin's conduct, even from the mind run of reprehensible conduct. Um, first Devlin testified that he knew that it was unconstitutional for a law enforcement officer to aid in a repossession. In other words, he knew what he was doing was unconstitutional. And yet he nevertheless chose to do it. And he chose to use threats of violence and false arrest to do so. And second, those threats of violence are important here. What Gore points out is that threats and of course, acts of violence are particularly reprehensible. And here we don't have just a private party threatening violence. We have an officer of the state doing so with a gun and a badge. And the final point I want to point out on reprehensibility is that Devlin testified that if he had to do it all over again, would he change anything? And he said, absolutely not. And there's a line in Gore about how flagrancy is perhaps the most important thing in determining punitive damages, the amount of punitive damages. And here, what the jury had was a defendant who knew that it was unconstitutional to do what he was doing, who used threats of violence and arrest against an innocent woman to do it. And who said, if given the chance, he would do the same thing all over again. The jury certainly could have believed that strong medicine in the words of Gore was necessary to cure this defendant's disrespect for the law. And nothing in the Constitution prohibits it from doing so. Ms. Bennett, what do you make of our statement in the case of Willow Inn versus Public Service, 2005 Third Circuit case, where we observed that, quote, few awards exceeding a single digit ratio between punitive and compensatory damages to a significant degree will satisfy due process? I think that that's largely true in the mine run of cases. But as the Supreme Court noted in Gore, that's not necessarily true when you have a case where there's an egregious harm that is not measured in compensatory damages. And in those cases, because what the real relationship we're looking for here is between punitive damages and harm, either actual or potential harm. And if the actual or potential harm is not captured by the punitive, rather by the compensatory damages, so for example, in the case of a violation of a constitutional right, which is not compensable in compensatory damages, the harm and the potential harm is going to be much greater than what's reflected in the compensatory damages. And so a ratio between the punitive damages and compensatory damages in those kinds of cases is expected to be much higher. And there are several civil rights cases we cite in our brief where this is exactly the case. And any other rule, of course, would undermine the whole purpose of punitive damages. Because if you could only use a single digit ratio when you have an egregious harm, but that doesn't result in much compensatory damages, then the punitive damages would simply always be too small to deter violations of constitutional rights. But the district judge didn't necessarily agree with your sense of how egregious this mistake was, correct? I mean, obviously, the district judge said that it was reprehensible enough to support a punitive damages award, but not severe enough or egregious enough to support what he apparently viewed as a runaway award of half a million dollars. Wasn't that the district judge's take on that? It's not entirely clear to me, honestly, from the district court's opinion, what exactly the district court thought the problem was. The district court really did focus on this ratio. But in terms of reprehensibility, I think, and the ratio, for that matter, I think the district court made two main errors. The first is that the district court seemed to think that conduct, that malice required some sort of either personally targeted motive, like he did this because he hated the plaintiff in particular, as opposed to he intentionally violated her constitutional rights. And that's not right under Gore, which says that malice means affirmative misconduct. And it's not right under this court's decision in Willow Inn, which said that the malice factor is intended to encompass intentional misconduct as opposed to the mere accident. And the second mistake the district court made was that it's not clear exactly what the district court meant by potential harm, but it certainly undervalued the potential harm in this case and discounted it in a way that is inconsistent with the Supreme Court's decision in TXO. And I can turn to that potential harm now, which is if Angela's wife had not complied with Devlin's unconstitutional threats, then the jury could easily have believed that he would have followed through on those threats. He would have broken the window. He would have forcibly removed her and would have arrested her for a crime she did not commit. Well, that's actually a question that I have. With respect to potential harm to Johnson, how does that fit in analytically to our analysis? So I think it can be used in two ways. The first way is that it can be used to determine the reprehensibility here. So the reprehensibility is higher both because threats of violence themselves are extremely reprehensible and because the jury could reasonably have believed that he would have that it can be used in determining the reasonable relationship between the amount of punitive damages and the harm and potential harm here. And so the fact that it's basically arbitrary, it has nothing to do with Devlin, the fact that he did not in this case break a window, assault a woman, and arrest her for a crime that she did not commit. It's simply because Angela's wife complied. And so the jury could reasonably believe that it needed to deter this conduct to happen to someone else. And there's nothing in the Constitution about punitive damages at all, but there's certainly no constitutional values that I can think of that would require, that would prohibit a jury from awarding punitive damages based on the need to deter this kind of conduct simply because of the happenstance that in this case, it was the car owner's wife sitting in the car as opposed to the car owner herself. And Corporal Devlin cites Philip Morris, but Philip Morris doesn't really govern here. And that's for two reasons. The first reason is that Philip Morris says, we're only talking about direct punishment. We're saying that the jury cannot directly punish you for harm to strangers to the litigation, but it doesn't say anything about the reasonable relationship, whether it can consider that harm in the reasonable relationship. And in fact, the jury instruction that Philip Morris was asking for was a jury instruction that would have considered harm to others in the reasonable relationship analysis. And the second reason that Philip Morris would prohibit a judge from considering potential harm to a third party under the proportionality part of the analysis, right? I don't believe it, and there are two reasons for that. I mean, first, it doesn't say anything about that. And indeed, the jury instruction that the court held was error not to give was a jury instruction that said you can consider harm to others in the reasonable relationship test, as long as you don't consider it for direct punishment. And so Philip Morris has at best nothing to say about it. And if anything, it indicates that it is permissible to do so. The second thing is I want to note that Philip Morris is really about strangers to the litigation. So there it's, you know, could the jury directly punish Philip Morris for the harm it caused to, you know, all Marlboro smokers? And what the court said is, well, no, I can't directly punish it for that harm, because if it did, it'd have a few problems. One, how does a defendant procedurally defend itself against allegations that it harmed unspecified people in unspecified ways? And also, again, the court was concerned about this problem of states using punitive damages so that their juries could punish corporations for conduct that occurred out of state that might have been lawful in that state. And even then, what Philip Morris says is, well, you just can't use it to punish directly. You could still use it in evaluating punitive damages. You can use it in reprehensibility. And it said nothing about the reasonable relationship test. And here, but here we're not talking about harm to strangers. We're talking about harm to the plaintiff's wife. That was an integral part of the constitutional violation here. The way that Corporal Devlin violated Angela's rights here is by threatening her wife with assault and arrest if she did not comply. And so that's a very different situation. None of the values that underlie Philip Morris, involving strangers to the litigation, even apply here. And there's nothing in the Constitution, nothing in the Supreme Court's case law that has anything to say about this. And I want to note that there's a line that often talks about, how do we know how to evaluate a jury's punitive damages award when there's no legal error, unlike Gore or State Farm? And for that reason, Justices Scalia and Thomas dissented from this whole project and said, look, this is basically a values question. How wrong was the conduct and how much in need of deterrence is it? And those are questions that we give to our juries in our legal system. And if there is no legal error, if the procedures are fair, then it's really difficult. The only way a court can decide that a jury's verdict is wrong is simply to have a disagreement in values. How does that help you though? Because I mean, Justices Scalia and Thomas lost. Of course. I mean, they don't think this is constitutionally cognizable, right? Yes. And of course, I'm not saying that this court should ignore the right that exists, but I am saying that it counsels caution in expanding the right, as the defendant argues here, because as the right increases, there'll be increasing problems figuring out what the line drawing should be. Especially in cases like this, where there are no constitutional values on the other side. There's no reason. The court has given us though. I mean, I understand you're making you're making a textualist or an originalist argument about there being no constitutional values here, but State Farm and Gore, the Supreme Court has told us otherwise, right? The Supreme Court has said, look, there's nothing in the text that says a single digit ratio or a six to one ratio. You know, the court, one could argue, just made that up, right? But isn't it incumbent upon the district judge here and this circuit court in this appeal to apply that factor, that sort of that ratio? I don't know if you'd call it a test or what you'd call it, but isn't that wasn't that the district judge's job? And isn't that precisely what the district judge did here? So it is. I absolutely agree that it is the district court's job and this court's job to apply Supreme Court precedent. And that one aspect of Supreme Court precedent is assessing what the relationship is between punitive damages and harm or potential harm. But it is not where the district court erred. Is it focused particularly on the relationship between punitive damages and compensatory damages? And that's not what that factor is. For example, if you take the Supreme Court's decision in TXO, in that case, there was a 526 to one ratio between punitive damages and compensatory damages. And what the Supreme Court said there is that's fine. And it did so for two reasons. First, because the conduct was reprehensible. The defendant knew what it was doing, knew it was violating the law and did so anyway, just like here. And second, it looked to the potential harm. You know, it said the compensatory damages do not accurately reflect the potential harm and therefore the need for deterrence in that case, simply because the defendant's plan did not come to fruition. And that's exactly the case here. The compensatory damages here do not reflect the potential harm that could have happened because of Devlin's conduct, simply because Angela's wife complied. It had nothing to do with Devlin that this didn't come to fruition. And so under TXO, what the district court should have considered is the relationship between the punitive damages and the actual and potential harm, not the compensatory damages. And Corporal Devlin has not disagreed that a reasonable value for the potential harm in this case is $250,000. And if you take that reasonable value into account, what you get is, you know, a two to one ratio at most. And so that is well within the Supreme Court's case law, even for big economic cases, let alone for civil rights cases like this one, where the compensatory damages cannot possibly ever encompass all the harm, because you can't get compensatory damages for the violation of a constitutional right. And make anything of the fact that TXO was decided before Gore and well before State Farm? It was, but Gore at least, and I believe State Farm, although I'd double check, cites TXO. And what Gore says specifically is in Gore, TXO was not relevant because there was no threatened harm. There was no additional threatened harm in Gore that did not come to pass. Here, that's not the case. Under Gore, where there is threatened harm that did not happen to come to pass, as here, you take that into account in determining what the relationship is between the punitive damages and the actual or potential harm. And to not do so would be to expand this constitutional right well beyond what the Supreme Court has said it encompasses. And here, it would do so based on totally arbitrary distinctions. There's no concern about notice in this case, for example. There's no concern about notice in any case where the harm to the third party is an integral part of the constitutional violation itself. Similarly, there's no concern about one state regulating the conduct in another state. Again, in a case where the harm to the third party is integrally related to the constitutional violation itself. There's simply nothing in the Constitution and nothing in the Supreme Court's case law that would prohibit a jury from considering the harm that Devlin could have caused and decided it needed to deter him from causing that harm to others. And I want to step back quickly in closing. You're out. You're well out of time. So I apologize. But I want to Judge Mady or Judge Hardiman, do you have any other questions? No. I had one. It's back on qualified immunity. Would this case still fall within the scope of Abbott if Devlin actually believed he needed Johnson out of the car in order to protect passing motorists, protect their safety? So two answers to that. One is in qualified immunity, the question is objective. So it doesn't matter what Devlin subjectively believed. It's what a reasonable officer would objectively believe. And that question is a jury question. So if he wanted to rely on the idea that a reasonable officer would have objectively believed that there was a safety issue, he's required to submit a special interrogatory to the jury on that. Because he And in that light, you know, there's lots of testimony that there was no, you know, his main safety issue argument is that the car was lifted off the ground. So he had to get her out. But there's lots of testimony that says that's not true. And so and so under taken in the light was favorable to Angela. This is clearly governed by Abbott and Harvey. It says you can't threaten to arrest someone for for in order to facilitate the repossession of private property. Okay. All right. Thank you, counsel. Thank you. We'll hear from your from your friend. Thank you, your honors. And just just to sort of pick up on that last point, and then I'll move to punitive damages on the safety issue. And I was, I believe is that the tow truck was partially in the roadway. So any reasonable officer, you know, whose duty it is to, you know, protect the roadways and the safety of individuals would recognize that as something that that can't take place. As far as the punitive damages, um, one, we do disagree that the ratio is not two to one, this isn't a $250,000. Um, you know, decision, I saw that was in a briefing, and counsel just stated that we do disagree with that. And, well, their their argument is that the actual harm, we all know the actual harm as a fixed by the jury was 5000. But their argument, as I understand it, is that they can also argue potential harm, and that they're arguing that the potential harm was 250,000. Right, your honor, and it's all based on speculation, like these, these harms didn't actually occur. We don't know if, you know, Corporal Devlin, like, if you look at the video, like he's not raising his voice, he's, he's, he's trying to get her out of the video, or out of the out of the car. Well, he was using verbal judo, and he had no intention of physically removing or he thought he could coax her out of the car, and he was successful. But do we do we accept that as true? That's a question, because the jury did not need to disbelieve him, I don't think to rule in Miss Hyman's favor. But the jury may have disbelieved him when he said that maybe the jury thought that he really was going to break the window. And he said he was going to break a rear window away from Johnson. Well, yes, your honor. I think that next to her. And that's why he further explained how, you know, things could how he would break the window. But further, and with regards to punitive damages, one, and, you know, assuming the court doesn't grant qualified immunity in this case, the district court, and I don't think we should lose focus of this did grant punitive damages in this case, he granted them at a six to one ratio. And the district court went through the Gore factors, he went through all each of the and, you know, although the, the Pele may disagree with the district court's findings, they're not clearly erroneous. And that is the standard, even though the court has de novo review, that's really the standard that the court applies in these punitive damage cases. And, you know, I would point the court to a decision I believe that came out last year, Jester v. It's, it's analysis of the ratio. But the court didn't determine it itself. It remanded the case back to the district court for further factual findings. In this case, we have the factual findings, the district court did not believe that, you know, the potential harm, you know, any harm to miss Hyman rose to the level of a $500,000 punitive damage award. And, you know, it is the court's duty to, you know, guard against, you know, these unconstitutional words. And that's what the court did in this case. As far as reprehensibility, the first factor is the is the actual harm. It's very unclear what the what the physical harm was to miss Hyman. In her own testimony, she says that she's not blaming Corporal Devlin for the physical injuries that that happened to her. So how is the she wasn't blaming him for her, her pre existing condition. She she moved to Nantico with a physical problem, right? Yeah. But she was certainly blaming him for the nightmares, the recurring nightmares, the inability to sleep, things like that, right? I don't think the record is clear on that, Your Honor. Apparently, Miss Hyman had issues with police officers in the past. Obviously, the situation could bring up different things. But it's unclear. And this is what the district court found as well exactly where these harms arise out of. And so that's, you know, the factual findings of the district court. And I don't think that they're clearly erroneous, given the testimony of Miss Hyman. And so, you know, the ratio that the court granted in this case is certainly from the position of Corporal Devlin, if punitive damages are to be granted as appropriate in this case. Thank you, counsel. All right. Thank you, Your Honor. We will take the case under advisement. But before you go, we want to thank you for your excellent oral advocacy and your excellent briefing here. It's good to see you. I hope you enjoyed the zoom argument. We do. It's a heck of a lot better than the telephone, I think but but you did a terrific job. Thank you. Again, we'll take the case under advisement and